UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| AARON ISBY-ISRAEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:12-cv-00116-JMS-MJD |
| | ) | |
| BRUCE LEMMON Commissioner of IDOC, | ) | |
| JAMES WYNN Director of classification in the IDOC, | ) | |
| STANLEY KNIGHT interim Deputy Commissioner in the IDOC, | ) | |
| RICHARD BROWN Superintendent at W.V.C.F., | ) | |
| JACK HENDRIX Asst. Superintendent of W.V.C.F., | ) | |
| JERRY SNYDER unit Team Manager of W.V.C.F., | ) | |
| BEVERLY GILMORE Case Work Manager of W.V.C.F., | ) | |
| JULIE SNIDER Counselor of W.V.C.F., | ) | |
| DUSTY RUSSELL Custody Supervisor of W.V.C.F., | ) | |
| | ) | |
| Defendants. | ) | |

**Findings of Fact and Conclusions of Law**

The Court conducted a bench trial in this action on July 27 and 28, 2015, in Indianapolis, Indiana. The plaintiff, Aaron Isby-Israel, was present in person and by counsel.[1] All defendants were present by counsel and defendant Jerry Snyder was present in person both days. Defendant Brown was also present in person on the second day of trial.

On the second day of trial, counsel for the defendants moved for judgment as a matter of law as to defendants James Wynn, Beverly Gilmore, Julie Snider, Jack Hendrix, and Dusty Russell.

---

[1] The Court greatly appreciates the capable representation that volunteer counsel, Kenneth Roberts, Adam Lenkowsky, and Tasha Roberts of Roberts & Bishop provided to the plaintiff.

That motion was granted as to defendants James Wynn, Julie Snider, and Dusty Russell and denied as to defendants Jack Hendrix and Beverly Gilmore. Defendants Richard Brown, Jack Hendrix, Jerry Snyder, and Beverly Gilmore remain in the action.

The plaintiff's due process claim was resolved on summary judgment in favor of the defendants. Dkt. 65. The claim remaining for trial is whether the plaintiff's confinement in segregated housing at the Wabash Valley Correctional Facility ("Wabash Valley") for almost nine years violates his Eighth Amendment right to be free from cruel and unusual punishment. After consideration of the evidence presented during the bench trial, the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).[2]

The plaintiff alleges that some of the conditions of his confinement are as follows:

a. He has been isolated from other prisoners and has no opportunity for social contact with other human beings.

b. He is confined to his single-man, windowless cell 23-24 hours each day.

c. He eats all of his meals alone from food trays passed by correctional officers through a narrow port in the cell door.

d. Lights are kept on around the clock. He suffered from sleep deprivation and he experiences seeing spots, blurred vision, and burning and tearing of his eyes.

e. He has no access to vocational, work, or educational programs that are offered to the general population inmates.

f. His out-of-cell exercise is limited to one hour a day in a cramped enclosed space or cage, with no exercise equipment.

---

[2] Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.

g. He is permitted to shower three times a week, while inmates in general population are allowed to shower daily.

h. General population inmates receive daily access to a telephone, while he is allowed one phone call each week, if that.

i. He has been given new clothes once every several years, while general population inmates are issued new clothing each year.

j. His outgoing and incoming personal and legal mail is subjected to an open mail rule, meaning that it is routinely searched and read by defendants and other staff.

k. During the fall and winter months, the defendants frequently keep the segregation cells too cold as a means of behavior modification and punishment.

l. Hot water is often turned off.

### I.    Findings of Fact

Mr. Isby-Israel has been incarcerated in the Indiana Department of Correction ("IDOC") continuously since April 1989, based on a conviction of robbery with serious bodily injury. On or about October 12, 1990, when he was incarcerated at the Pendleton Correctional Facility, a canine unit was ordered into Mr. Isby-Israel's cell to perform a cell extraction and Mr. Isby-Israel stabbed two correctional officers and stabbed and killed the canine with a homemade weapon. He was convicted of two counts of attempted murder and battery and was sentenced to an additional forty years in prison.

On October 4, 2006, Mr. Isby-Israel was transferred (from the Westville Correctional Facility) to Wabash Valley. He was initially placed in the general population where he remained for 19 days.

On October 23, 2006, Mr. Isby-Israel was placed in department-wide administrative long-term segregation in the Secured Housing Unit or SHU (now called the Special Confinement Unit or SCU). Mr. Isby-Israel has remained in administrative segregation (now called administrative restrictive status housing) since that time except for the period of December 29, 2014, to March 29, 2015, when he was in disciplinary restrictive status housing in the SCU.

Mr. Isby-Israel had four major (Class A or B) conduct reports between 1999 and 2007, but he did not have a major disciplinary infraction from March 2009, until December of 2014. IDOC policy allows for an offender to be placed in department-wide administrative restrictive housing when that offender has a history of battery on others or presents an extraordinary threat to themselves or others or presents special safety and security concerns. The decision to keep Mr. Isby-Israel in segregated housing is reviewed every month and he may request a full review every 90 days. Mr. Isby-Israel has been kept on department-wide administrative segregation/restrictive status housing because of his past behavior, violent tendencies, inability to cooperate with Wabash Valley staff, and refusal to participate in self-help programs.

On December 15, 2014, Mr. Isby-Israel was using a phone in his cell. Correctional Officer Jaymison Bennett went to the cell to retrieve the phone when Mr. Isby-Israel's 20 minutes of time was up. Mr. Isby-Israel became angry because the officer did not allow him time to say goodbye. Officer Bennett reported that Mr. Isby-Israel threw the phone toward the cuff port on his cell door. Mr. Isby-Israel testified that he set the phone back on the cuff-port. Video evidence shows that Mr. Isby-Israel took a swipe with his hand toward the officer through the cuff-port. Officer Bennett then sprayed Mr. Isby-Israel with OC spray and wrote him up for attempted battery without a weapon. Mr. Isby-Israel was found guilty of that disciplinary charge.

Mr. Isby-Israel testified that during his whole history in prison he has been involved in "progressive political activity." He has filed lawsuits charging the administration with mistreatment of himself and other prisoners. He has gone on hunger strikes and brought media attention to how prisoners are treated. He has filed hundreds of grievances.

IDOC policy requires that administrative segregation units be "clean, healthy, safe and secure." Mr. Isby-Israel resides in a cell that is about 80 square feet. Mr. Isby-Israel is confined to his single-man, windowless cell 23 hours each day. He may be out of the cell for social visits, attorney visits, medical appointments, recreation in the outdoor recreation areas, showers, and meetings with prison staff as needed.  He has a television and a desk and is able to do some exercises such as push-ups in his cell.  The cell has windows in the interior, through which Mr. Isby can see the range hallway over which there is a skylight.  There is also a clock on the range that is visible from Mr. Isby's cell.

Offenders in the SCU communicate with correctional staff and medical/mental health personnel when they are on the ranges for the passing out of medication and mental status reviews. Offenders may write and receive letters to and from family and friends. Offenders on the SCU may and can communicate orally from cell to cell with other offenders and when they are in the recreation area.  Mr. Isby might communicate with another offender either on the range or during recreation if he considers the offender to be compatible with him.  Often as offenders communicate on the range other offenders will disrupt the conversation with radios or by speaking loudly. Mr. Isby-Israel sometimes keeps to himself.

Mr. Isby-Israel is allowed one 20 minute personal phone call each week and legal calls as needed, if verified through an attorney or court. Offenders in the SCU are provided access to a telephone by giving the offender a telephone in his cell.

Out-of-cell exercise is provided one hour a day in either a partially enclosed space that is outside of and attached to the range (the housing unit, consisting of 12 cells) or in recreation areas that are outside, eight on each wing, consisting of four chain link sides and a chain link top covered by bird netting and allowing the offenders who are out at the same time to talk with one another through the fences from recreation pad to recreation pad. The exercise equipment available in the recreation areas are limited to a higher than regulation basketball hoop and a pull up bar. Sometimes offenders are unable to use the recreation area due to staff shortages. The IDOC Administrative Procedure sets a minimum of five recreation periods per week.

The cell contains a security light that is on 24 hours per day. That light is between 5 and 9 watts. The wattage depends upon what the supplier has available when the order is placed. Although a former SCU inmate testified that the security lights in the SCU are brighter than those in general population at Wabash Valley, Superintendent Brown testified that the night lights in general population are the same wattage as they are in the SCU. It is undisputed that the security light cannot be controlled or blocked by the inmate. It is against the rules to cover the lights. No rule, however, prohibits an offender from putting a towel, a shirt, or other clothing over his eyes when he sleeps. The main, larger light in each cell can be turned off and on by the inmates. Without the 24 hour security light, officers would not be able to see into the cells when they walk through the ranges.

Mr. Isby-Israel testified that he often has difficulty sleeping because of the 24 hour lighting. He also testified to having headaches which he did not have before he was confined at Wabash Valley. He testified that he often feels frustrated, angry, and irritable.

On May 14, 2013, Mr. Isby-Israel complained of blurry vision and said he was very nearsighted. He reported that he no longer had his old glasses. Ex. 101, p. 399. New glasses were provided on June 4, 2013. *Id.,* p. 416.

Mr. Isby-Israel sleeps on a thin vinyl covered foam mattress that lays over a concrete slab. In early 2014, Mr. Isby-Israel complained of having back pain that began in 2013. The medical records reflect that his symptoms improved somewhat in July of 2014 with high velocity-low amplitude osteopathic manipulative treatment. Ex. 101, pp. 565-66.

Mr. Isby-Israel is 5'11". Over the past five years, Mr. Isby-Israel's weight has fluctuated between 148 and 163 pounds. In September 2010 he weighed 152 pounds and in April 2015 he weighed 148. Mr. Isby-Israel eats all of his meals alone in his cell from food trays passed by correctional officers through a narrow slot (the "cuff port") in the cell door.

Aramark Food Services contracts with the State to provide meals to inmates. A dietician checks the meals to ensure that they meet nutritional standards. Sample menus placed in evidence reflect that the standard for daily calories for an adult age 19-50 is 2800. Ex. 5. Those menus reflect that the number of calories actually served, averaged on a weekly basis, never matched or exceeded 2800 calories in 2014 and early 2015. *Id.* Rather, meals usually averaged approximately 2526, or close to 300 calories short of the standard, or approximately 90% of the standard. *Id.* In their proposed findings of fact, the defendants direct the Court to a U.S. Department of Agriculture dietary guideline which purportedly indicates that a 45-year old sedentary male's daily caloric need is actually 2200, however, the Court will not make a finding based on materials not offered or discussed at trial, especially in light of the prison's own menus indicating a different standard.

Mr. Isby-Israel and the other inmates on the SCU are permitted to shower three times a week. Offenders in the SCU are provided a change of clothing once a year with whites exchanged

every six months. This is often used clothing and is taken from available stock. Offenders may obtain warmer clothing if they can afford to purchase it from commissary. Mr. Isby-Israel complains that the laundry facilities are inadequate and that his clothes often come back dirty and smelling musty so he tries to hand wash all of his clothes.

All outgoing legal and personal mail and incoming personal mail is subjected to an open mail rule so that staff can check for contraband and to ensure that the sender or recipient really is as listed on the envelope. This means that Mr. Isby-Israel's general, non-legal mail is routinely searched and read. Outgoing legal mail is checked to ensure that it is entitled to treatment as legal mail but is not read, copied, or otherwise interfered with in either sending or receipt.

Temperatures in the SCU are maintained within normal limits, except for some circumstances when it becomes too hot or too cold, which is then addressed by physical plant staff as soon as possible. There was evidence of one occasion when temperatures were so low that other housing was found for the offenders and some had to be forced to move for their own safety.

Mr. Isby-Israel has no physical access to a law library. He must specially order any legal material he needs.  There is no evidence that this limitation interfered with his ability to present this case.

Mr. Isby-Israel does not have access to all of the vocational, work, or educational programs that are offered to some general population inmates. There are very few jobs available on the SCU to clean up or do other work on the range.

Mr. Isby-Israel is not now receiving and has not received treatment for mental illness from the mental health staff. Seriously mentally ill inmates are not housed on the SCU. Mr. Isby-Israel has been seen by mental health providers at frequent (weekly, 30 day, and 90 day) intervals to determine whether he has any mental health concerns that would require him to be removed from

the SCU. This review is required under the terms of the settlement in *Brian Mast, et al. v. J. David Donahue as Commissioner of the Indiana Dept. of Correction*, Cause No. 2:05-cv-37-LJM-WGH, docket entries 75, 104. The records of these visits comprise Ex. 101a, and those that contain a report of anything resembling a complaint about mental health are summarized: (pp. 284-85, July 6, 2012, Mr. Isby-Israel reported "I'm doing the best I can under the circumstances." He reported no current mental health concerns.); (p. 305, Sept. 21, 2012, stated "I'm okay but I'd be better if they let me out of here." He reported no current mental health concerns.); (p. 394, May 1, 2013, "How do you think I'm doing?" He reported he was the same as last time he was asked. Reported no current mental health concerns, but he appeared frustrated by his situation in segregation.); (p. 464, Oct. 7, 2013, Reported he was doing alright at this time but did complain about his time in segregation being excessive, 7 years. He was referred to speak with unit team about expectations he could meet to get off segregation. No apparent need for mental health treatment at this time.); (p. 505, Dec. 23, 2013, Doing okay without any significant mental health or medical concerns.); (p. 541, Mar. 26, 2014, Declined offer of private session because he had no particular mental health concerns to discuss that needed privacy, reported he was doing alright at this time, and denied any current mental health concerns); (p. 547, April 23, 2014, same); (p. 558, June 17, 2014, same); (p. 561, July 17, 2014, same); (p. 569, Aug. 13, 2014, same); (p. 596-97, Nov. 3, 2014, same); (p. 606, Dec. 30, 2014, same). The medical records show that no mental illness has been reported to or detected by the mental health staff. Most often, if awake or communicative, Mr. Isby-Israel reports that he is "alright."

This is not to say that some of Mr. Isby-Israel's behavior might not be described as anti-social. However, based on his conduct reports and criminal history, it is clear that this sort of behavior in fact pre-dated his time in segregation at Wabash Valley.

Sometimes when mental health staff stop by his cell to make a segregation determination, Mr. Isby-Israel is asleep and does not respond. On those occasions, the mental health staff person notes on the medical chart that he was "unable to assess mental status at this time." There is no record that Mr. Isby-Israel ever requested but was refused mental health treatment.

The IDOC offers some self-help programs, including the Actions, Consequences and Treatment ("ACT") Program and the Moral Reconation Program. Both programs are designed to help offenders look at their past behavior and try to formulate a new way of looking at things. The programs include counseling and help inmates learn how to make better decisions. These programs offer a means for inmates to earn their way out of the SCU. In the past, some inmates have also been released from the SCU without having participated in these programs.

In August of 2014, Unit Team Manager Snyder met with Mr. Isby-Israel to advise that Mr. Snyder was considering transferring Mr. Isby-Israel from administrative restrictive status housing. Mr. Snyder advised Mr. Isby-Israel that prison officials were reviewing all offenders who had been in restrictive status housing for five years or more, and that they were going to be recommending in probably all of those cases transfer to the New Castle Correctional Facility transition unit because of the amount of time those inmates had been in a restrictive setting. Any offender recommended for release from the SCU would be recommended for transfer to the transition unit at New Castle.

The IDOC implemented the New Castle transition program to provide a step-down program for offenders who had been in restrictive status housing for more than a couple of years. New Castle has more programming than that available in the SCU, and the transition

unit is designed to give offenders a greater opportunity for success in adjusting to general population. The program does involve a therapeutic component that would require an inmate to accept responsibility for his own actions.

When discussing the New Castle program with Mr. Snyder, Mr. Isby-Israel became very adamant about the fact that he would not go and they could not make him go to that unit. He wanted to be released to general population at Wabash Valley. He said that there was no reason for him to go to the New Castle unit because he didn't need and was not interested in participating in any programs. Mr. Snyder continued to try to talk with him but every time he tried to do so Mr. Isby-Israel would interrupt him. So, Mr. Snyder discontinued the interview and Mr. Isby-Israel was not recommended for release or transfer to the transition unit. Several other long-term segregation inmates were recommended and were transferred to the New Castle program.

Mr. Snyder did not recommend Mr. Isby-Israel for the program because it requires a level of cooperation and it would do Mr. Isby-Israel no good if he refused to participate. Mr. Snyder is concerned that if Mr. Isby-Israel were placed in general population without going through a transition program, his anger issues would present a safety issue for prison staff and other offenders. Mr. Snyder is aware of times during the past few years when Mr. Isby-Israel has been uncooperative, argumentative, and disrespectful of staff. Those incidents are not always written up in conduct reports because when an offender is already in long-term restrictive status housing, some officers overlook some of the "minor" infractions by those offenders.

Mr. Isby-Israel believes that the ACT Program is a "mind restructuring program" "designed to indoctrinate certain prisoners and turn them into snitches." If Mr. Isby-Israel was interested in participating in programs like the ACT Program, he would have been recommended immediately. Mr. Isby-Israel has chosen not to participate in those types of self-help programs.

## II.     Conclusions of Law and Analysis

No free citizen can truly comprehend what it must feel like to live in segregated housing in prison, however, all adults in society, free or imprisoned, must learn at some point to take responsibility for their own actions and to understand that introspection into their own behavior can help allow change to occur. When pride or anger or frustration are clung to as a badge of honor, no shift in circumstances can be made. Mr. Isby-Israel is rightfully proud of his vigilance concerning his civil rights, however, his hypervigilance perhaps is sometimes misplaced and is not serving his own desires at this time. It appears that almost every action prison officials take is met with hostility and suspicion. As explained in this Entry, although the Court *is greatly disturbed* by the length of time that Mr. Isby-Israel has spent in segregation, the Court ultimately finds that Mr. Isby-Israel's continued placement in that type of housing is currently a result of his own refusal to cooperate in any way with prison officials in efforts to transition him into the general housing population.

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "An Eighth Amendment claim has two components—objective and subjective. To satisfy the objective component, the deprivation alleged must be, objectively, sufficiently serious." *Delaney v. DeTella,* 256 F.3d 679, 683 (7th Cir. 2001) (internal citations and quotations omitted). "To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a 'sufficiently culpable state of mind.'" *Townsend v. Cooper,* 759 F.3d 678, 689 (7th Cir. 2014) (quoting *Farmer,* 511 U.S. at 834).

Courts have added substance to the Eighth Amendment's "cruel and unusual" language "by consulting the 'evolving standards of decency that mark the progress of a maturing society.'"

*Delaney,* 256 F.3d at 683 (7th Cir. 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). "Thus, conditions which may have been acceptable long ago may be considered unnecessarily cruel in light of our growing understanding of human needs and the changing norms of our society." *Id.* (citing *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (1988) ("The conditions in which prisoners are housed, like the poverty line, is a function of a society's standard of living. As that standard rises, the standard of minimum decency of prison conditions, like the poverty line, rises too.")). "'[P]rolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment (and therefore the Fourteenth), depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement.'" *Townsend,* 759 F.3d at 690 (quoting *Rice ex rel. Rice v. Correctional Medical Services,* 675 F.3d 650, 666 (7th Cir. 2012)).

With respect to the effects of segregation on his mental health, Mr. Isby-Israel testified to feeling intense anger, irritability, and difficulty concentrating. He also testified that sometimes he doesn't feel like getting out of his cell even the few times he has the opportunity to do so. He sometimes chooses not to go to outside recreation because he feels dehumanized by being hand-cuffed and led by a leash. The Court gives full credit to this testimony, however, it cannot find evidence that Mr. Isby-Israel took advantage of any of the opportunities to speak with mental health practitioners, engage in counseling, or otherwise discuss or attempt to diffuse these difficult circumstances.

"[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). "24-hour lighting involving a single, 9-watt fluorescent bulb does not objectively constitute an 'extreme deprivation.'" *Vasquez v. Frank,* 290 Fed.Appx. 927, 929 (7th Cir. Aug. 15, 2008). The testimony from Wabash Valley officials that having some

light in each of the cells 24 hours a day is required for security purposes was credible and reasonable. As in *Vasquez,* "the refusal to turn off the light in [plaintiff's] cell had a valid penological purpose." *Id.* at 930. "But even assuming that 24-hour lighting involving a single 5-watt light bulb might constitute an 'extreme deprivation' prohibited by the Eighth Amendment, *see Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Gruenberg v. Gempeler,* 697 F.3d 573, 579 (7th Cir.2012), we agree with the district court that the guards were not deliberately indifferent to this need. Allowing the plaintiffs to cover their eyes with towels was a reasonable response to their complaints." *Mathews v. Raemisch,* 513 Fed.Appx. 605, 607 (7th Cir. March 25, 2013). As in *Mathews,* Mr. Isby-Israel was allowed to cover his eyes with clothes or towels if the light disturbed his sleep. Inmates in the SCU were only prevented from covering the lights themselves.

"Allowing inmates only two showers and four hours of outside recreation each week does not violate the Eighth Amendment." *Vasquez v. Braemer,* 586 Fed.Appx. 224, 228 (7th Cir. Sept. 23, 2014) (collecting cases that approved of one shower weekly and three hours weekly of outdoor recreation when indoor exercise was allowed). There is no evidence that the opportunities provided for exercise in the SCU denied movement or caused muscle atrophy. *See French v. Owens,* 777 F.2d 1250, 1255 (7th Cir. 1985). The number of showers and hours of outside recreation made available to Mr. Isby-Israel each week passes constitutional muster.

The evidence supports Mr. Isby-Israel's testimony that meal portions served in the SCU are small. He is receiving 90% of what Aramark Food Services reports is the proper amount of calories. Inmates are entitled to adequate nutrition. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (The Eighth Amendment imposes duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care"). Prisoners do not have a right to "tasty or even

appetizing" food. *Williams v. Berge,* 102 Fed.Appx. 506, 507 (7th Cir. June 24, 2004) (citing *Lunsford v. Bennett,* 17 F.3d 1574, 1578 (7th Cir. 1994) ("cold, poorly prepared beans" did not state Eighth Amendment claim)). In a food deprivation claim, "a court must assess the amount and duration of the deprivation." *Reed v. McBride,* 178 F.3d 849, 853 (7th Cir. 1999) (citing cases satisfying the objectively serious component when prisoners were not fed for 2-12 days, but depriving one out of every nine meals did not violate the Constitution). The consequences of food deprivation must also be considered. *Jaros v. Ill. Dept. of Corr.,* 684 F.3d 667, 671 (7th Cir. 2012) (occasionally missing breakfast did not endanger inmate's health). Although the Court has concerns that Aramark is not meeting its own caloric standards, Mr. Isby-Israel's weight over the past five years has not fluctuated greatly, and there is no evidence of any severe health problems caused by the amount or nature of food provided. These circumstances do not violate the Eighth Amendment.

While the evidence showed that Mr. Isby-Israel did not often receive new clothing, he was provided clothing sufficient for his needs. There is no credible evidence that the clothing provided failed to meet his minimal necessities or that any serious problems have resulted from the laundering process.

Even having considered the total effect of Mr. Isby-Israel's circumstances, the Court finds that they do not rise to the level of extreme deprivation of basic human needs required to satisfy Eighth Amendment standards. Some of those conditions can also be improved by Mr. Isby-Israel himself, if, for example, he chooses to go outside for recreation more often or chooses to speak with a mental health practitioner about his frustration and anger.

The Court is aware of the recent reminder by the Seventh Circuit Court of Appeals to "both prison officials and judges to be alert for the potentially serious adverse consequences of protracted

segregation as punishment for misbehavior in prison, especially the kind of nonviolent misbehavior involved in the present case." *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015). *See also Glossip v. Gross,* 135 S.Ct. 2726, 2765 (2015) (J. Breyer, dissenting) (death penalty case noting that "nearly all death penalty States keep death row inmates in isolation for 22 or more hours per day" and that "it is well documented that such prolonged solitary confinement produces numerous deleterious harms.").

The Court is also aware of Justice Kennedy's concurring opinion in a recent capital case, *Davis v. Ayala,* 135 S.Ct. 2187 (2015), in which he spoke out on the issue of solitary confinement even though it admittedly had "no direct bearing on the precise legal questions presented by this case." *Id.* at 2208. The plaintiff had most likely spent 20 years or more in a windowless cell for 23 hours a day with little or no opportunity to talk or interact with anyone. *Id.* "The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators." *Id.* at 2209. "Of course, prison officials must have discretion to decide that in some instances temporary, solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates. But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Id.* at 2210. "In a case that presented the issue, the judiciary may be required, within its proper jurisdiction and authority, to determine whether workable alternative systems for long-term confinement exist, and, if so, whether a correctional system should be required to adopt them." *Id.*

The Court finds that this is not that case. The Court has considered the extreme duration of the segregation, the conditions of Mr. Isby-Israel's confinement, and whether there were feasible alternatives to that confinement, and concludes that Mr. Isby-Israel has avenues that he could take to lead him to general population, but he simply has chosen not to attempt them.

Mr. Isby-Israel believes that the programs that would provide a process to ease him into general population are there to brainwash him. The Court is mindful that prison life often presents a battle of wills, and Mr. Isby-Israel has been vigilant in refusing to bend his. But requiring him to complete a program that might demonstrate some acceptance of the consequences of his actions before he is rehoused in general population is not unreasonable. Had he completed such a program and still not been allowed to move to less restrictive housing, this would be a very different case. Had there been evidence that he is seriously mentally ill, or requested and was denied mental health treatment, this would be a very different case. Mr. Isby-Israel cannot be punished forever for killing a canine and attacking prison officers in 1990. But, as long as he remains oppositional to almost every program recommended by prison staff, his circumstances may not change unless department wide changes are made in the standards imposed for segregated housing. This presents a somewhat unique circumstance where feasible alternatives – the New Castle transition program, the ACT program - do exist, but they are alternatives that reasonably require Mr. Isby-Israel to cooperate, and he has steadfastly refused to do so.

The Court cannot say that Mr. Snyder's concerns about Mr. Isby-Israel's anger issues are unreasonable. The Court is convinced that if Mr. Isby-Israel had been the least bit willing to cooperate with and participate in programs offered to help him with his transition into general population, he would have been allowed that transfer. The Court urges him to do so.

### III.     Conclusion

The Court is mindful that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment (and therefore the Fourteenth), depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement." *Townsend,* 759 F.3d at 690 (internal quotation omitted). And prior to trial the Court

considered the duration of Mr. Isby-Israel's confinement in administrative segregation to be stunning, but the Court has found no case under similar circumstances where duration alone, coupled with a prisoner's refusal to participate in correctional programming, supported a finding of a constitutional violation. Based on the foregoing, the Court finds that the defendants are entitled to judgment in their favor, and the plaintiff shall take nothing from his second amended complaint. Final judgment shall now issue consistent with this Entry and with the Entry of July 30, 2013 (dismissing defendants Lemmon and Knight).

**IT IS SO ORDERED.**

Date:  September 25, 2015

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Electronically Registered Counsel